# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 8, 2005 Session

## RHYNUIA L. BARNES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2542     Walter J. Kurtz, Judge**

---

**No. M2004-01557-CCA-R3-PC - Fled September 2, 2005**

---

The petitioner appeals the denial of post-conviction relief, alleging various instances of ineffective assistance of counsel as well as a violation of his rights under the Confrontation Clause.  Upon review of the claim under the Confrontation Clause, we conclude that counsel was not ineffective and that the statement did not prejudice the petitioner.  We further conclude that the evidence does not preponderate against the post-conviction court's finding that counsel rendered effective assistance of counsel.  Therefore, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined.  JOSEPH M. TIPTON, J., concurs in results only.

Charles I. Malone, Nashville, Tennessee, for the appellant, Rhynuia L. Barnes.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bernard F. McEvoy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Facts and Procedural History

In July 1999, the petitioner, Rhynuia L. Barnes, was convicted of one count of premeditated first degree murder and received a sentence of life imprisonment. This court affirmed the conviction on direct appeal.  See State v. Rhynuia Lamont Barnes, No. M2001-00631-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 521, at **2-3 (Tenn. Crim. App., at Nashville, June 24, 2002).

On July 1, 2003, the petitioner filed a *pro se* petition for post-conviction relief.  A week later, the trial court issued an order, noting deficiencies in the petition as filed and giving the petitioner fifteen days to refile the petition in compliance with statutory requirements.  On July 21, the

petitioner refiled his petition and the post-conviction court appointed counsel. On October 9, 2003, the petitioner filed a first amendment to his petition, apparently *pro se*. On January 27, 2004, the post-conviction court granted appointed counsel's motion to withdraw and appointed present counsel to represent the petitioner in his post-conviction proceedings.

On March 25, 2004, the petitioner filed, through counsel, a second amended petition alleging: (1) various instances of ineffective assistance of counsel; and (2) a violation of the Confrontation Clause. The post-conviction court held an evidentiary hearing on June 2, 2004, and subsequently denied relief by written order.

This court's direct appeal opinion provides a summary of the facts underlying the appeal in this case:

> Joyce Martin testified she lived with her two sons, 24 year-old Da'Shon Martin, the victim, and 19 year-old Carlton Martin. She stated that on September 2, 1997, at approximately 2:00 p.m., Tom Morrell, a neighbor, came to her door and asked if the victim [was] home. Martin responded the victim was sleeping in his room, and Morrell walked toward his room and told the victim someone wanted to see him. Morrell then walked out of the residence and returned to his home. Martin stated she looked outside her house and saw the [petitioner], whom she had never met, standing at her gate. The victim exited the residence, stood on the porch, and inquired what the [petitioner] wanted. Martin said she next saw the [petitioner] brandish a pistol, at which time the victim ran back inside the house. The [petitioner] then said, "Your son stole my jewelry, and I'm going to kill him;" the victim ran to the back of the house; and the [petitioner] ran to her backyard with his gun in his hand. Martin explained her back door was secured by a deadbolt key lock which required a key to open.
>
> Martin further testified she phoned 911 while the victim was hiding in the back of the residence, and the [petitioner] was in the backyard. The [petitioner] then ran back inside her front door holding his gun. The [petitioner] then said twice that he would shoot the victim's mother if the victim did not come out of hiding. At that point, the [petitioner] ran toward the bathroom at the rear of the house, and another man, later identified as James Barnes, the [petitioner's] father, entered the residence and inquired about his son. Martin told James Barnes the [petitioner] went to the rear of the house. Martin testified she then heard one shot and fled from the residence to a neighbor's home. Martin identified the murder weapon as the gun she saw in the [petitioner's] hand.

Barnes, 2002 Tenn. Crim. App. LEXIS 521, at **2-3. As a result of the events of that day, the victim died and both the petitioner and his father, James Barnes ("Barnes"), were initially suspects. Id. at *8. Specifically, Barnes was found to have in his possession "three live .38 shells" and was bleeding from an abrasion on his hand. Id. at *5, 7. However, the charges against Barnes were dropped at the preliminary hearing after the petitioner confessed to the crime and stated that Barnes "had 'nothing to do with it' and had tried to stop [the petitioner] from going into the Martin

residence with his gun." Id. at *8. At trial, the State played an audiotape that contained a double hearsay statement of "an unknown officer indicating [that] James Barnes said the defendant shot the victim." Id. at *20. The trial court ultimately denied the defense's request for a mistrial and issued a curative instruction, noting that the hearsay statement corroborated the defense's theory of the case.

At the post-conviction hearing, trial counsel testified that the petitioner's defense was that Barnes shot the victim and coerced the petitioner to confess to the crime through intimidation. Counsel stated that she was aware that both the petitioner and his father were arrested as co-suspects and that Barnes had three .38 caliber shells in his pocket and an injury on his hand. She further testified that, after the murder weapon was recovered and analyzed for prints, the results revealed that the prints lifted from the gun did not match those of the petitioner. While she acknowledged that she believed the print may have belonged to Barnes, she stated that she was not aware of any way to compel him to provide prints for comparison. She further stated that she did not entertain the possibility of getting the print surreptitiously because she did not know where Barnes was. Counsel also stated that she did not recall whether the police conducted a gunshot residue test on either the petitioner or Barnes to determine who, in fact, fired the weapon.

Counsel also stated that, although she "would have loved to" have interviewed Barnes, she never attempted to, and further explained, "I did not know where [] Barnes was. I talked with [the petitioner] on several occasions about getting [] Barnes involved in this case and [the petitioner] did not want to do that." She further testified that the petitioner would not assist her in locating Barnes. Counsel stated that she spoke with both the petitioner and his mother during trial about getting Barnes involved in the petitioner's defense; however, she stated, "They were both fearful of [] Barnes, and I told them that the police would protect them and they laughed at me." Regarding the failure to call Barnes as a witness, counsel testified that his absence from the witness list was a strategic decision based on the understanding that, if called to the stand, Barnes would incriminate the petitioner.

As to the double hearsay statement introduced by the State *via* audiotape, counsel explained that she filed a motion in limine, which was granted by the trial court, to preclude all of Barnes' hearsay statements. She testified that she did not know that the State was going to play the tape as they were under court order not to introduce such statements. She further stated that once the tape began to play, she expected the State to stop the tape before the hearsay statement was played. Counsel testified that after Barnes' hearsay statement played, she was "very angry" and:

> was kind of wondering if [she] should stand up and make a big deal out of it in front
> of the jury or if [she] should wait until there was an opening and a break for [her] to
> kind of slip and not call a lot of attention to what had happened in front of the jury.

When asked why she did not object before the statement played, she reiterated that she thought the State was going to stop the tape prior to that point. Specifically, she stated, "I had no idea the State was going to play it, sir. The State was under an order not to put in any hearsay statements by [] Barnes, and I trust a court order."

On cross-examination, counsel testified that she met with the petitioner weekly in the four months preceding trial, with each meeting lasting between thirty minutes and one hour. She further stated that an investigator talked to neighborhood residents, the victim's mother, and had "a lot of contact" with the petitioner. Counsel also testified that she reviewed all discovery material and discussed trial strategies with the petitioner, considering every possible defense available to him, prior to trial.

Counsel testified that she knew that the petitioner told police he acted alone in killing the victim and that the victim's mother identified the petitioner as entering the home with a gun and chasing the victim to the back of the house. Counsel stated that, based upon the facts of the case, she believed the only available defense was that the petitioner gave a false confession and that Barnes had, in fact, murdered the victim. She reiterated that the petitioner made it clear on multiple occasions that he did not want to involve his father in the defense because he was afraid of him. Counsel testified that she felt that calling Barnes as a witness carried an "extremely high" risk and that she thought it would be more beneficial to assert that the petitioner was not the killer if his father was not present; she believed this position would be bolstered by the fingerprint analysis indicating that the petitioner's prints were not on the weapon.

Counsel further stated that it "would have been very nice" to have been able to determine whose prints were left on the murder weapon; however, she knew of no legal vehicle that could have been utilized to compel Barnes, who was not a criminal defendant, to submit to print analysis.

As to the double hearsay statement, counsel reiterated that she believed the State was under court order not to produce hearsay statements of Barnes and that she did not object to the playing of the tape because she thought the State had redacted the portion of the tape containing the hearsay statement. Counsel recalled that she requested a mistrial after the statement played; however, it was denied by the trial court. She also acknowledged that the statement was consistent with the defense theory that Barnes killed the victim and forced the petitioner to accept responsibility.

On redirect examination, counsel reiterated that, although she wanted to speak with Barnes, the petitioner did not want to involve him in the case. As a result, counsel determined that "it might be easier to point the finger at someone who [was] not there." She further acknowledged that the jury heard Barnes' hearsay statement and that the petitioner never got the benefit of cross-examination from defense counsel. Counsel also admitted that she did not consult with other attorneys about how she might obtain Barnes' prints for comparison. Finally, she acknowledged that she was mistaken in believing that the motion in limine excluded the taped statement and further explained:

> I had an order from The Court saying there were no statements of [] Barnes to be put in front [of] a jury. So I trust a court order. And based upon my experience of trying other cases, I know that the State is very good about keeping hearsay statements out.
> …
> I believed that court order absolutely protected [the petitioner].

Sandra Barnes, the petitioner's mother, recalled that both her son and her husband were arrested for the shooting death of the victim. She further testified that, although they maintained separate residences, she saw Barnes more than once a week because they lived in the same neighborhood. She stated that Barnes was living openly in Nashville and was not avoiding defense counsel or the police. Finally, she stated that Barnes did not leave town during the petitioner's trial.

The petitioner testified as the final witness at the post-conviction hearing. He stated that his defense at trial was that his father shot and killed the victim. He further testified that the police did not perform a gunshot residue test on him or his father. The petitioner stated that he submitted to fingerprint analysis and that the results indicated that his prints did not match those taken from the murder weapon. He also testified that he showed the investigator where his father lived, and when asked whether he instructed counsel to involve his father, the petitioner responded, "Anything that is going to get me off, do what you have to do." Finally, he stated that his father passed away in October 2002..

At the conclusion of the hearing, the post-conviction court took the petition under advisement and subsequently issued an order denying relief. Regarding the Confrontation Clause issue, the post-conviction court opined:

> Whether this issue is defined as prosecutorial misconduct, breach of the hearsay rules, or violation of the right of confrontation, the trial court gave a curative instruction and the Court of Criminal Appeals ruled that that instruction cured any error. Any consideration of prejudice must be measured against the facts testified to at trial and the petitioner's multiple confessions that he killed the victim.

As to the remaining issue of ineffective assistance of counsel, the court found that "in all respects, except possibly one, the trial counsel's services were well within the range of competence demanded by attorneys in criminal cases." The court went on to note that the only possible exception, trial counsel's failure to require redaction of the double hearsay played before the jury, was remedied when the trial court gave a curative instruction, which was held by this Court to be sufficient to curtail any prejudice that might have resulted. In sum, the court found that, "[I]f there was error on counsel's part it was not an error that had an adverse effect on the verdict." Therefore, the trial court denied post-conviction relief and the petitioner filed a timely appeal to this court.

Analysis

I. Confrontation Clause

The petitioner first contends that Barnes' hearsay statement being played for the jury violated his rights under the Confrontation Clause, notwithstanding the curative instruction offered by the trial court. The Confrontation Clause of the Sixth Amendment provides two types of protection for criminal defendants: the right to physically face those who testify against him and the right to cross-examine witnesses. Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987). The State

contends that this issue is waived because it was not raised on direct appeal but was raised for the first time in the post-conviction court.

In determining whether we are to address the merits of the issue, we reference the Post-Conviction Procedure Act, which governs the action before us. First we note that Tennessee Code Annotated section 40-30-104(e) states that:

> [t]he petitioner shall include allegations of fact supporting each claim for relief set forth in the petition and allegations of fact explaining why each ground for relief was not previously presented in any earlier proceeding.

Upon review of the petition and subsequent amendments, it appears that the petitioner failed to explain why this issue was not presented on direct appeal. We further note that section 40-30-106(g) states that:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1)    [t]he claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2)    [t]he failure to present the ground was the result of state action in violation of the federal or state constitution.

It appears that neither exception above-referenced applies in this case.

However, the Act also requires the district attorney general to respond to the petition, asserting any applicable affirmative defenses at that juncture. See Tenn. Code Ann. § 40-30-108(d) (2003). In this case, the district attorney did not assert any affirmative defenses, i.e. waiver or previous determination but, rather, filed a one-sentence answer to the petition denying the factual allegations contained in the petition and demanding "strict proof thereof." The State's failure in this regard prevents it from asserting any applicable affirmative defenses for the first time on appeal. Tenn. R. App. P. 36(a); see also State v. Smith, 6 S.W.3d 512, 515 n. 3 (Tenn. Crim. App. 1999).

Furthermore, the post-conviction court could have summarily dismissed the claim sua sponte, as the petition failed to demonstrate that the claim was not waived or previously determined. Tenn. Code Ann. § 40-30-106(f) (2003). However, the post-conviction court opted to hear the merits of the claim at the post-conviction hearing. Therefore, based upon the procedures employed by all parties to this point, we feel compelled to review the petitioner's Confrontation Clause claim for harmless error. See State v. Edwin Gomez and Jonathan S. Londono, 163 S.W.2d 682 (holding that all Confrontation Clause violations, including those governed by Crawford, are subject to a harmless error analysis).

Upon review, we conclude that the petitioner's inability to cross-examine Barnes was, in fact, harmless beyond a reasonable doubt. The record reflects that overwhelming proof was presented at trial implicating the petitioner as the murderer. Specifically, the evidence established that the petitioner requested that Morrell summon the victim from his home, that the petitioner brandished

-6-

a weapon, and that he accused the victim of stealing his jewelry. The record further reflects that the petitioner chased the victim to the back of the residence and threatened to kill the victim's mother if the victim did not come out. The petitioner then ran outside as Barnes entered the residence to inquire as to his son's whereabouts. Immediately thereafter, the victim was shot three times and died as a result. During an interview at the police station following the incident, the petitioner confessed to killing the victim. We therefore conclude that due to the overwhelming proof of the petitioner's guilt, his inability to cross-examine Barnes was harmless beyond a reasonable doubt.

## II. Ineffective Assistance of Counsel

Second and finally, the petitioner asserts various instances of ineffective assistance of counsel, including:

1) counsel's failure to interview Barnes;
2) counsel's failure to investigate whether the police performed gun shot residue testing on the petitioner or Barnes;
3) counsel's failure to attempt to procure Barnes' major case prints;
4) allowing the State to play the audiotape of Barnes' double hearsay statement;
5) counsel's failure to subpoena Barnes to testify at trial; and
6) counsel's failure to effectively present the petitioner's defense through the witnesses who were called to testify.

When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show that: (1) counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court required that the services be rendered within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002).

It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the petitioner must establish a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

The petitioner bears the burden of proving the factual allegations that would entitle petitioner to relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). We review the post-

conviction court's factual findings underlying a claim of ineffective assistance of counsel under a *de novo* standard with a presumption that those findings are correct – unless the preponderance of the evidence establishes otherwise. Burns, 6 S.W.3d at 461. However, the post-conviction court's conclusions of law – such as whether counsel's performance was deficient or whether that deficiency was prejudicial – are reviewed under a de novo standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001).

The petitioner first contends that trial counsel was ineffective for failing to interview Barnes. However, the post-conviction court accredited the testimony of counsel, who stated that the petitioner instructed her not to involve Barnes in his defense and failed to assist her in locating him. Therefore, the post-conviction court found that trial counsel was not ineffective in this respect. We conclude that the evidence presented on appeal does not preponderate against the finding of the post-conviction court.

Regarding the failure to investigate the absence of gun shot residue testing, the post-conviction court found that "there was no evidence produced at the [post-conviction] hearing indicating what a gunshot residue test would or would not have indicated." We agree and conclude that, in the absence of evidence indicating prejudice, this claim of ineffective assistance of counsel cannot be sustained.

The petitioner also contends that counsel was ineffective in failing to obtain Barnes' major case prints for comparison to the prints lifted from the murder weapon. In support, the petitioner cites for the first time on appeal the Supreme Court case in Hayes v. Florida, 470 U.S. 811, 105 S. Ct. 1643 (1985). In Hayes, the Court opined:

> We also do not abandon the suggestion in Davis and Dunaway that under circumscribed procedures, the Fourth Amendment might permit the judiciary to authorize the seizure of a person on less than probable cause and his removal to the police station for the purpose of fingerprinting. We do not, of course, have such a case before us. We do note, however, that some States, in reliance on the suggestion in Davis, have enacted procedures for judicially authorized seizures for the purpose of fingerprinting. The state courts are not in accord on the validity of these efforts to insulate investigative seizures from Fourth Amendment invalidation. (footnote omitted).

Id. at 817. Furthermore, the only Tennessee case interpreting Hayes held that, absent probable cause to arrest a suspect, fingerprint evidence must be suppressed as "fruit of an illegal detention." State v. Michael Johnson, C.C.A. No. 86-174-III, 1986 Tenn. Crim. App. LEXIS 2863, at *2 (Tenn. Crim. App. Dec. 12, 1986).

Therefore, given the holding in Johnson, we cannot conclude that counsel's failure to attempt to obtain the prints by way of the courts amounted to deficient performance. We likewise conclude that counsel's failure to procure the fingerprints surreptitiously did not constitute deficient performance. In support, we note that counsel indicated at the post-conviction hearing that she was unaware of Barnes' location and received no aid from the petitioner in her attempts to locate Barnes.

-8-

In sum, the petitioner has failed to prove by clear and convincing evidence that Barnes' prints could have been obtained through legal avenues or surreptitiously. Therefore, we conclude that counsel's failure to obtain the prints did not constitute deficient performance.

Next, the petitioner avers that counsel failed to prevent the State from playing James Barnes' double hearsay statement before the jury. The post-conviction court noted: "The only possible exception to [counsel's effective assistance] was [her] failure to require redaction of the James Barnes double hearsay played to the jury." However, the court went on to note that the jury ultimately received a curative instruction regarding the statement and that a panel of this court concluded on direct appeal that the instruction "was sufficient to remove any problem of prejudice regarding the playing of the taped statement."

We first note that the petitioner has failed to show that trial counsel's actions amounted to deficient performance. The record reveals that counsel recognized the potential hearsay statements and filed a proper motion in limine to exclude the hearsay statements of Barnes, which was ultimately granted by the trial court. In our view, these pre-trial procedures provided counsel with a reasonable expectation that the statement would not be played and placed the onus on the State to abide by the order. Furthermore, counsel indicated that she did not object once the statement was played because she was fearful that an objection would highlight the content of the statement to the jury. We conclude that the entire course of counsel's actions were well-within the range of competency demanded of criminal defense attorneys.

Moreover, the hearsay statement did not prejudice the petitioner. As we have previously noted, this court addressed this issue in the context of prosecutorial misconduct on direct appeal and concluded that the use "of a curative instruction was a proper remedy" and that "the [petitioner] suffered no prejudice." Barnes, 2002 Tenn. Crim. App. LEXIS 521, at *22 (citing Tenn. R. App. P. 36(b)). Therefore, the issue of prejudice has previously been addressed, and we will not relitigate it in this proceeding. See Long, 510 S.W.2d 83, 87 (Tenn. Crim. App. 1979).

The petitioner also alleges that counsel's failure to subpoena James Barnes amounted to ineffective assistance. However, the post-conviction court accredited trial counsel's testimony that the petitioner did not want to involve his father in his defense. Further, the court accepted counsel's testimony that, as a tactical matter, it was more advantageous to place responsibility on an absent party than one who was present in the courtroom. Accordingly, the post-conviction court rejected this claim of ineffective assistance. We conclude that the evidence does not preponderate against this finding.

Finally, the petitioner avers that trial counsel ineffectively presented his defense through the witnesses who testified. Specifically, the petitioner contends that trial counsel: (1) failed to effectively establish, through cross-examination of the victim's mother, that Barnes was present in the back of the house at the time of the shooting; and (2) failed to effectively cross-examine police investigators as to the circumstantial and scientific evidence implicating Barnes as the shooter. First, contrary to the petitioner's claim, the record reflects that trial counsel elicited favorable testimony

from the victim's mother which established that Barnes was in the back of the house with the petitioner at the time of the shooting and that the victim's mother was unable to see who shot the victim.

As to the remaining contention, we note that the police investigators were not called as witnesses at the post-conviction hearing. In order to prove ineffective assistance of counsel, a petitioner must show that: (1) a benefit was lost; and (2) as a result of the lost benefit, there was a reasonable probability that the case would have concluded differently. Burns, 6 S.W.3d at 463. Because we are unaware of the testimony that could have been elicited on cross-examination, we are unable to conclude that it would have changed the outcome of the case in any way. Therefore, having failed to prove prejudice, the petitioner is not entitled to relief on this ground.

### Conclusion

The denial of the post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE